**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GEORGE GRAVES,**

                        **Plaintiff,**                    **1:03-CV-266**
                                                          **(GLS/RFT)**

            **v.**

**FINCH PRUYN & COMPANY, INC.,**

                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**

Office of Nathaniel B. Smith          NATHANIEL B. SMITH, ESQ.
111 Broadway
Suite 1305
New York, NY 10008

**FOR THE DEFENDANT:**

Couch, White Law Firm               MICHAEL T. WALLENDER, ESQ.
540 Broadway
Albany, NY 12201

**Gary L. Sharpe**
**U.S. District Judge**

## DECISION AND ORDER

### I. Introduction

Following remand from the Second Circuit, Finch Pruyn & Company,

Inc. ("Finch Pruyn") has renewed its summary judgment motion seeking

dismissal of the Americans with Disabilities Act ("ADA") claim of its

employee, George Graves.[1]  The sole issue is whether Graves was denied

a reasonable accommodation when Finch Pruyn refused to give him two

weeks unpaid leave.[2]  An objective evaluation of the circumstances existing

at the time of Finch Pruyn's decision reveals that it had already

accommodated Graves for a year, it was confronting a business hardship

because of Graves's absence, and it had no assurance that the requested

accommodation would likely result in Graves's successful return to work.

Accordingly, Finch Pruyn's decision was reasonable as a matter of law, its

motion for summary judgment is granted and Graves's complaint is

dismissed.

## II.  **Facts**

Over a lengthy career, Graves worked his way up from laborer in the

wood room of paper manufacturer Finch Pruyn to a position of paper

---

[1]Familiarity with the Circuit's opinion is presumed.  *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181 (2d Cir. 2006).

[2]Finch Pruyn also asserts that while it denied Graves's request for an additional two weeks, it granted an equivalent accommodation because it provided Graves with three weeks partial duty at full pay.  If this was Finch Pruyn's sole argument, the court would deny summary judgment because there are factual issues as to whether the substitute accommodation was indeed equivalent to that which Graves sought.

inspector in the quality-assurance department.  He was promoted to that

position in 1991 and successfully performed his duties until he began

having problems with a bone spur on his heel in late 1999.  Paper

inspectors are on their feet 85% of their shifts, frequently lift up to 30

pounds of paper and move rolls weighing up to 3500 pounds.  By early

2000, Graves could no longer perform these essential job duties without

surgical repair and treatment of the bone spur.

In anticipation of impending surgery and as an accommodation to

Graves's disability, Finch Pruyn assigned him light duty work from January

through May 10, 2000.  If consistent with its operational business needs,

Finch Pruyn's employment policy authorized temporary light duty

assignments for those with a short-term medical prognosis of returning to

the full-time duties of their regular job.

On May 10, Graves left work on temporary disability in order to

surgically repair his heel.  Finch Pruyn's temporary disability policy

provided six months of benefits, and Graves received full pay until his post-

surgical return on September 4, 2000.  When he returned, he still

experienced foot pain and could not perform his essential job functions.

Again, Finch Pruyn accommodated his disability, and gave him a light duty,

3

full pay assignment of training two new paper inspectors.  That assignment

ended on October 30, 2000, Finch Pruyn told Graves that it had no further

light duty assignments consistent with its operational needs.  Accordingly,

Graves again left work on temporary disability leave.  His six months of

entitlement ended in December 2000, but Finch Pruyn continued his full-

time pay through January 4, 2001.

On January 4, 2001, Michael Strich, Finch Pruyn's Human-

Resources Director, gave Graves three options: (1) return to full-duty work

immediately; (2) take a 64% pay cut and work at a desk job; or, (3) have a

doctor state that Graves was totally disabled and take disability retirement

with resulting disability pension benefits of $269,000.  The details of the

January 4 Strich and Graves conversation and the ensuing events are at

the heart of the Circuit's remand.  *See generally*, *Graves*, 457 F.3d at 184-

186.

For purposes of Finch Pruyn's renewed motion, the Circuit has

concluded that Graves responded to Strich's options by requesting a finite

two week unpaid leave of absence in order to determine his chances for

rehabilitation by consulting a foot specialist, Dr. O'Connor.  This additional

two weeks would not have required Finch Pruyn to hold open Graves's

4

position indefinitely.  *See id.* at 185-86.  In this court's original oral decision,

it referred to this request for two weeks leave as "indefinite."  That

statement violated the summary judgment rule requiring the resolution of

disputed facts in favor of Graves, the non-moving party.  *See id.* at 186.  As

is sometimes unfortunate with oral decisions, the court was not as clear as,

in hindsight, it should have been.

Unquestionably, Graves sought a finite period of two weeks to

consult with Dr. O'Connor.  However, the reasonableness of that request

requires analysis of what the two weeks would have accomplished

regarding the feasability of his return to work.  In support of its summary

judgment motion and this issue, Finch Pruyn cites a January 10, 2001,

report authored that day by Dr. Welch, Graves's primary physician.  (*See*

Defendant's Supplemental Rule 7.1(a)(3) Statement of Material Facts

("Def. SMF") at ¶ 2; Dkt. No. 60-3.)  In that report, Dr. Welch opined that

Graves was totally incapable of performing his job, and his physical

limitations would preclude the resumption of full-time employment for a

period of at least six months.  (*See id.*)  In his response, Graves admitted

the Welch prognosis, but argued that the report was drafted at his request

so that it would support his disability election.  (*See* Plaintiff's Response

5

("Pl. SMF") to Def. SMF at ¶ 2; Dkt. No. 64.)  He further averred that Dr.

Welch supplied Finch Pruyn with a different report six days earlier on

January 4, 2001.  (*See id.*)  According to Graves, that report noted:  he was

seeking a consultation with Dr. O'Connor; a surgical procedure might

relieve the foot disability; and, after two or three months of recuperation

from surgery, he might be able to return to gainful employment. (*See id.*)

Graves now argues that the January 4 report provided assurances that he

would return to full-time work.  (*See* Graves Memorandum of Law ("MOL")

at 8-11; Dkt. No. 63.)

     As the court recently observed, conclusory allegations, conjecture

and speculation do not create disputed factual issues sufficient to thwart

summary judgment.  Often, the cogent facts are self-evident in the

underlying record.  *See Reinhart v. City of Schenectady Police Dep't*, Nos.

1:05-CV-630 (Lead), 1:04-CV-317 (Member), 2009 WL 383756, at *1 & fn.

5 (N.D.N.Y. Feb. 10, 2009).  As it relates to Graves's ability to return to full-

time employment, the January 4 report actually states:

> ... it is unlikely that he will be able to return to his previous
> occupation.  We anticipate that he will be left with a permanent
> restriction of activities.  This restriction will include not being on
> his feet for more than an hour to an hour and a half total in an
> eight hour day.  Secondly, this hour to hour and a half must be

broken up into frequent intervals of not more than three to five minutes each at a frequency of at least two per hour.... He also cannot be in a situation that he has to lift or carry anything weighing more than 5 to 7lbs.  This is basically describing an extremely sedentary job which is totally different then (s*ic.*) anything that he has been doing up until the present time."

(*See* Ex. Tab 10 to Wallender Aff.; Dkt. No. 21:21.)  As it relates to future recovery post-consultation with an orthopedic surgeon, the report states:

> ... [i]f there is something surgically that can be done to relieve the symptomatology in his foot, it is likely that it will take another two to three months of recovery following such surgery before he could return to any kind of gainful employment, and even then there will probably [be] some restrictions in the amount of standing walking lifting and carrying that he can do. I have asked George to try to obtain copies of job descriptions of both his current job title as well as any potentially lighter job titles that might come close to matching the above description. If no such job is going to be available on a permanent basis, then we will probably be forced next week to make the assumption he will be permanently disabled from working at Finch Pruyn....  I've tried very hard to explain to George that the impairment he has will remain unchanged regardless of whatever jobs may or may not be available.  We are both in agreement that ... this overall disability is probably not total in that he could indeed handle a very light sedentary type job, but this maybe [sic] only on a part-time basis, and may not be fully available to him through a company such as Finch Pruyn.

(*See id.*).

Strich refused Graves's request for two additional weeks.  *See*, *Graves*, 457 F.3d at 185.  Consequently, Graves elected to take the

disability retirement because he felt he had no other choice.  (Pl. SMF at

¶¶4, 5.)  He then caused Dr. Welch to transmit a January 10 report to Finch

Pruyn finding Graves to be totally disabled for the foreseeable future; at

least six months.  (*Id*. at ¶2.)  After this Welch diagnosis, there was no

further discussion about Graves's medical condition with Finch Pruyn.  (*Id*.

at ¶¶3, 7, 8, 12.)  As a courtesy to Graves, Finch Pruyn allowed him to

continue employment in a light duty capacity at full pay until the end of

January.  (*Id*. at ¶23.)  He subsequently retired on February 1st, and

received a lump sum disability payment of $269,335.  (*Id*. at ¶5.)  Down

three paper inspectors due to disability, Finch Pruyn permanently filled

Graves's paper inspector position with an employee who previously

occupied a temporary position.  (*Id*. at ¶¶24, 25.)

On February 2, 2001, Graves consulted with Dr. O'Connor who

diagnosed Graves with an inflamed ossicle in his foot and treated him with

steroid injections.  (See Graves Tr. 128:14-129:11, Dkt. No. 45.)  In mid-

February the ossicle was surgically removed.  (*Id*. at 129:17-130:1.)  As a

result, Graves has apparently regained full use of his foot without pain.  (*Id*.

at 143:22-144:1.)  He did not seek reemployment with Finch Pruyn nor did

he rescind his retirement.  (Pl. SMF ¶17.)

## III.  Discussion

**A.    Summary Judgment Standard**

The summary judgment standard is well-established, and will not be repeated here.  For a full discussion, the court refers the parties to its opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

**B.    Graves's ADA Claim**

Graves must establish a *prima facie* case in order to survive summary judgment on his ADA disability claim.  *See Rodal v. Anesthesia Group of Onondaga*, 369 F.3d 113, 118 (2d Cir. 2004).  In order to satisfy his initial burden, he must show:  "(1) [he] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [he] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Id*.  Here, only the third and fourth elements are at issue, and the narrow question is whether Graves's two week request to schedule a consultation with Dr. O'Connor was a reasonable accommodation which Finch Pruyn should have granted.  *See Graves*, 457 F.3d at 186 n.6.  Graves has the burden of proof on this issue.  *See*

9

*Parnahay v. United Parcel Serv., Inc.*, 20 Fed. Appx. 53, 56 (2d Cir. 2001).

The Second Circuit has not expressly held that a temporary leave of absence can be a reasonable accommodation. However, numerous other courts have so held, depending on the circumstances.

In *Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir. 1998), for instance, an employee requested temporary leave to treat her depression, even though her employer had already allowed her three weeks absence. *Id*. at 439-41. The employer denied the further accommodation and, on appeal from a verdict for the plaintiff, argued that such accommodation was not reasonable. *Id*. at 443-44. The First Circuit disagreed, stating that "[b]ecause [the employee's] physician was optimistic that the [additional] leave would ameliorate her disability, the jury could find her request a reasonable accommodation." *Id*. at 444. The court also noted that granting the accommodation would not pose an undue burden to the employer as the employee "was not asking for more leave than would be granted to a non-disabled, sick employee." *Id*.

In the Ninth Circuit case of *Humphrey v. Memorial Hosp. Ass'n*, 239 F.3d 1128 (9th Cir. 2001), the court found an issue of fact existed as to whether a leave of absence was a reasonable accommodation for an

10

employee's obsessive compulsive disorder.  While the benefits of the leave were not definite, the court provided that "[a]s long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation."  *Id*. at 1136 (quoting *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 879 (9th Cir. 1989)).  The court also found that a letter from the employee's doctor stating that her "condition was treatable and that 'she may have to take some time off until we can get the symptoms under better control'" was "sufficient to satisfy the minimal requirement that a leave of absence could plausibly have enabled [the employee] to perform her job."  *Id*.  In so holding, however, the court cautioned:

> the requirement to grant leave where there are plausible reasons to believe that it would accommodate the employee's disability can not be repeatedly invoked, thus permitting an unqualified employee to avoid termination by requesting a leave of absence each time he is about to be fired.... [T]he fact that a prior leave was granted and was unsuccessful may be a relevant consideration in determining whether additional leave would be a reasonable accommodation.

*Id.* at 1136 n.13.  *See also Evans v. Fed. Exp. Corp*., 133 F.3d 137, 140 (1st Cir. 1998) (employer not required to grant additional leave for

11

substance abuse disability in light of prior accommodations).  *But see, e.g., Criado*, 145 F.3d at 445 (stating that past accommodations do not absolve employer from providing future accommodations); *Picinich v. United Parcel Serv.*, 321 F.Supp. 2d 485, 516 (N.D.N.Y. 2004) ("An employer's duty to make reasonable accommodations is a continuing one, and will not be satisfied by a single effort.").

The Sixth Circuit case of *Walsh v. United Parcel Serv.*, 201 F.3d 718 (6th Cir. 2000), is most similar to the present situation.  In *Walsh* an employee was given a year of paid disability leave and six months unpaid disability leave as an accommodation for disabilities arising out of an automobile accident.  *Id.* at 721, 726.  Still unable to return to work following those accommodations, the employee sought more time for further medical evaluation, which was denied by the employer.  *Id.* at 721-22, 726.  Upholding the employer's action, the Circuit noted that the plaintiff had been given a year and a half of leave, during which he inexplicably failed to have the desired evaluation.  *Id.* at 727.  Even when finally completed, the evaluation "did not indicate a time frame or circumstances under which plaintiff could return to work."  *Id.*  The court concluded that "when ... an employer has already provided a substantial leave, an

12

additional leave period of significant duration, with no clear prospects for
recovery, is an objectively unreasonable accommodation." *Id*.  *See also
Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (holding that an
accommodation which will not allow an employee to perform the essential
functions of his job "presently, or in the immediate future" is not
reasonable).

   While this Circuit has not yet held that a temporary leave of absence
can be a reasonable accommodation, it will undoubtedly do so when it
decides the matter.  However, the fact that such a request may constitute a
reasonable accommodation does not, *ipso facto*, mean that it is reasonable
in every case.  The appropriate analysis requires an objective evaluation of
all circumstances, including whether the request is reasonable in light of
the unique employment circumstances and whether the employer has
some assurance that the absence could plausibly allow the employee to
perform the essential functions of his job in the near future.  In essence, the
cited cases seek to objectively juxtapose the sometimes competing aims of
allowing disabled employees to perform their duties with reasonable
accommodations, and the burden such accommodations place on the
employer.  *See, e.g., Jackan v. N.Y. State Dept. of Labor*, 205 F.3d 562,

565-67 (2d Cir. 2000).  Accordingly, the court turns to an objective analysis of the current case.

Graves initially asserts that '[h]ad Finch Pruyn] given [him] sufficient time to learn of the chances for rehabilitation, then [he] would have been able to inform it of Dr. O'Connor's diagnosis" and that, with treatment, he would likely be able to return to work without restrictions.  (*See* Graves MOL at 6; Dkt. No. 63.)  This argument ignores the fact that Finch Pruyn had already provided Graves with nearly a year of intermittent accommodations, and there was no diagnosis suggesting a return to full-time employment.  The court recognizes that an employer's past accommodations do not relieve it of an obligation to grant reasonable future requests.  *See Picinich*, 321 F. Supp. 2d at 516.  However, an employee must still exercise some diligence in using an accommodation, such as a leave of absence, to cope with his disability or neutralize it*.  See Humphrey,* 239 F.3d at 1136 n.13; *Walsh*, 201 F.3d at 727.  Here, Graves has offered no explanation as to why the past accommodations afforded by Finch Pruyn were insufficient to obtain his consultation, nor has he explained why an additional two weeks would have provided any assurance to Finch Pruyn that he would return to his full-time duties.

14

As to the latter, Graves's argument is flawed inasmuch as it posits that Dr. O'Connor's ultimate success in rectifying Graves's disability dictates that Finch Pruyn should have granted his request for more time to schedule further medical consultation.  However, a requested accommodation is unreasonable if the objective circumstances demonstrate that even if granted, there is no likelihood that it will facilitate a successful return to work.  The ADA does not require an employer to prognosticate a miraculous recovery or grant seemingly futile requests on the off chance that they may succeed.   Rather, the question is whether, at a time proximate to Graves's request for leave and its denial, Finch Pruyn was given some assurance that such leave could feasibly result in Graves's successful return to work.

Graves points to the January 4th report of Dr. Welch as providing such assurances.  In bald and conclusory fashion, he contends that the report optimistically predicts that surgery would allow him to return to full employment.  The court has extensively quoted that report which speaks for itself.  There is no "disputed fact" needing resolution at trial because no reasonable jury could accept Graves's selective interpretation which grossly overstates any prognosis for his recovery.  As quoted, the report

15

definitively states that Graves will be permanently disabled, and will permanently suffer physical restrictions that will preclude his resumption of his full-time job.  While the report endorses an orthopedic consultation, it clearly states that such intervention is unlikely to ever result in Graves's return to full-time duties.  Thus, the report gave Finch Pruyn no assurance that the definite leave of absence Graves sought could plausibly result in his ability to perform the essential functions of his job in the near future. While a more optimistic report might have imposed a duty to accommodate on Finch Pruyn, the January 4th report was followed by the January 10th report which was even more dire in its prognosis, finding Graves totally disabled for at least the next six months.[3]

While Graves argues that the January 10 report was prepared so that he could qualify for disability retirement, the report unquestionably provided no hope for a plausible recovery.  Subsequent to the January 10th report, Finch Pruyn received no further information whatsoever regarding Graves's medical condition.  Thus, at all times proximate to Graves's request for additional leave, the available information indicated that the request was

---

[3] Graves has objected to this report on the ground that it is inadmissible hearsay.  To the extent Finch Pruyn relies on Graves's medical records, it is to show their effect on Finch Pruyn's decisions, not to prove that their contents are true.  As such they are not hearsay.

futile.

Although Graves's prognosis for recovery is a significant factor in this analysis, it is not the only factor.  An objective evaluation also requires consideration of the business situation facing the employer who must determine the reasonableness of the requested accommodation.  For example, the analysis might differ if the employer was a sizeable company with a large, interchangeable work force.  Despite earlier accommodations, a request for an unpaid, two week leave of absence might be entirely reasonable if the employer could simultaneously accommodate a valued disabled employee and easily fill the vacuum caused by the employee's absence.

However, that is not the situation objectively confronted by Finch Pruyn.  In January 2000, it accommodated Graves's disability by honoring its employment policy and giving him a four month light-duty assignment while he consulted with his doctor in an effort to eliminate his disability.  It then held his job open for four months and paid him full-time disability benefits while he was out for remedial surgery.  When he returned, he still could not do his job, but they provided him with almost two more months of light-duty work.  Although he still could not do his job, there were no further

17

light-duty assignments, and he had exhausted his remaining disability leave, Finch Pruyn still gave him full-time benefits through January 4, 2001. Thus, when Strich had the conversation with Graves on January 4, Finch Pruyn had already provided a full year of various accommodations, and nothing had changed.  Graves still could not return to his duties and Finch Pruyn, at best, was faced with the prospect of a two week leave of absence, followed by three to four months of recovery, resulting in only partial rehabilitation.  Additionally, Finch Pruyn was then indisputably short at least two other paper inspectors due to disability during the time in question.  These burdens unquestionably outweighed the virtually non-existent expected benefit from the leave Graves sought.

The fact that Graves's disability was ultimately diagnosed, treated and remedied is certainly troublesome, at least from his perspective. Indeed, it is unfortunate that Dr. O'Connor was not consulted sooner.  That is not a situation, however, that can be laid at Finch Pruyn's doorstep. Given the accommodations afforded Graves over the course of a year, given the lack of any prognosis that an additional two weeks would lead to his reasonable return to work, and given the undue hardship Finch Pruyn was confronting, the failure to provide an additional two weeks of unpaid

18

leave was not a violation of the ADA. Under the ADA, "an employer is not required to provide a disabled employee with an accommodation that is ideal from the employee's perspective, only an accommodation that is reasonable." *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007)(citation omitted.)

## IV.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the defendant's motion for summary judgment (**Dkt. No. 60**) is **GRANTED** and the complaint is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk of the Court enter judgment and close this case; and it is further

**ORDERED** that the Clerk of the Court provide the parties with a copy of this Order.

**IT IS SO ORDERED.**

March 27, 2009
Albany, New York

_____
United States District Court Judge

19